IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | 4:17CR3047 |
| vs. | |
| JASON D. MCCAIN, | FINDINGS RECOMMENDATION AND ORDER |
| Defendant. | |

Pending before the court is the Motion to Suppress filed by Defendant Jason McCain. ([Filing No. 22](#)). McCain seeks to suppress all evidence obtained as a result of the April 22, 2017 stop and search of his vehicle. For the following reasons, Defendant's motion should be denied.

## BACKGROUND

After hearing the testimony and reviewing the documentary and video evidence, the undersigned magistrate judge finds the following facts are credible.

On Friday, February 24, 2017, at approximately 9:30 a.m., a branch of US Bank located at the corner of 56th Street and Highway 2 in Lincoln, Nebraska was robbed. The suspect was a lone black male wearing a dark-colored parka coat with a fur-lined hood. (Gov. Exh. 1). His face and hands were covered. He entered the bank, handed the bank employees a bag and told them to fill it.

Following the robbery, the suspect headed west on foot. One witness, a customer who was able to exit the bank while the robbery was occurring, called 911 and reported the robbery. This customer then followed the suspect when he left the bank and walked west toward a nearby apartment complex. The customer then lost sight of the suspect.

The Lincoln Police Department ("LPD") arrived at the bank minutes after the robbery occurred and began its investigation, which was led by LPD Investigator Timothy Cronin. Light snow was falling that morning and after following the path described by the witness, an LPD officer located freshly made footprints in the snow near the apartment buildings. Led by another officer and his canine, the officers were able to track the footprints to the corner of South 52nd Street and Boeckner Avenue. The officers canvassed the immediate area and observed that two of the east-facing homes on S 52nd Street had video surveillance cameras. The first home was on the corner of S 52nd and Boeckner Street ("Home 1"). (See Gov. Exh. 2). The second home was located 5 or 6 houses to the North of the first ("Home 2"). (See Id.). LPD made contact with the owners of those houses and eventually received their surveillance video recordings for the morning of February 24, 2017.

Reviewing these videos, it appeared that a White Ford SUV with white-painted bumpers, black door handles, and no visible front license plate drove Northbound on S 52nd Street around 9:07 a.m. past Homes 1 and 2.[1] (See Gov. Exhs. 3, 4, 4A, 4B, & 4C). Around 9:16 a.m., the SUV returned to the neighborhood with its back license plate now removed. The SUV parked on S 52nd Street approximately one house south of Home 2. (Gov. Exhs. 2, 3, & 4). The driver exited

---

[1] Although the video from Home 1 as entered into evidence as government exhibit no. 3 has a timestamp, Investigator Cronin testified that there was no perceptible timestamp when it was originally reviewed by the LPD. For that reason, the undersigned determined that the timestamps on Exhibit 3 would not be considered for making a determination on this motion. (See Filing No. 34 at CM/ECF p. 21). The video from Home 2 contains a timestamp superimposed on the video image itself which has always been perceptible. (See Gov. Exh. 4). Accordingly, the timestamp for Home 2 and a cross-comparison of the two videos forms the basis for determining the timeline of these events. (Compare Gov Exhs. 3 & 4). At the time of the investigation, LPD determined the timestamp for Home 2 was ahead by one hour, (i.e. where the stamp says 10:07 the actual local time was 9:07).

2

the SUV and began walking South on S 52nd Street then turned East on Boenecker Avenue, exiting the neighborhood and the view captured on the videos. (Gov. Exhs. 3 & 4). At around 9:34 a.m., a man can be seen on the Home 1 video walking West along Boeneckner Ave, turning North onto S. 52nd Street, approaching the SUV, entering it, and driving the vehicle North out of the view of both surveillance cameras. Correlating the timing of the robbery with the video footage, and having followed footprints in the snow from the bank to the S 52nd Street area depicted in the videos,[2] the LPD concluded that the robbery suspect walked to and from the bank from the S 52nd St and Boenecker Avenue neighborhood, and that he arrived in and left that neighborhood in the White SUV depicted in the home surveillance videos.

After the events on February 24, 2017, Investigator Cronin attempted to identify the SUV. He consulted with employees at the Anderson Ford car dealership and determined the suspect SUV was a 2002 to 2005 Ford Explorer. Cronin then performed a computer search and located roughly 60 or 70 vehicles registered in Lancaster County that may fit the description of the suspect vehicle. Cronin and other LPD officers visually observed each of these vehicles at the place where they were registered and concluded that none were the vehicle from the February 24, 2017 robbery. Each vehicle either had different door handle colors, wheel options, painted bumpers, bumper stickers, or other observable characteristics that were inconsistent with the suspect Explorer.

At that point, Investigator Cronin expanded the scope of his search to include vehicles from Omaha. After narrowing the search for known exclusions, Cronin concluded there were to 30 or 40 vehicles which could be the suspect Explorer in

---

[2] Based on their experience walking from the US Bank to the point where the tracked footprints stopped on S 52nd St., Investigator Cronin and the LPD officers knew the walk took approximately 5 minutes.

3

Omaha. Cronin and other LPD officers were able to locate, visually observe, and eliminate about half of the vehicles on the Omaha list. Defendant McCain's Ford Explorer was on Cronin's Omaha list, but the LPD officers were unable to personally observe McCain's vehicle during one of the trips to Omaha.

On Saturday, April 22, 2017, at approximately 9:25 a.m., the US Bank in Lincoln, Nebraska was robbed again. Investigator Cronin was in his office and received a communication describing the robbery. Like the suspect from the February 24, 2017 robbery, the April 22, 2017 suspect was described as a lone black male wearing a dark-colored parka coat with a fur-lined hood. (Gov. Exh. 5). According to the bank employees, the suspect appeared to be the same height, weight, and general appearance as the February robbery suspect, and he had the same mannerisms, voice, and style of clothing. Based on these factors, the employees of the bank reported to LPD that the April suspect was the same person who robbed the bank on February 24, 2017. But in the April robbery, the suspect escaped riding a bicycle North from the bank, carrying the stolen money in an orange bag.

Based on this information, LPD put out a broadcast reporting the robbery at approximately 9:30 a.m. that morning. The broadcast included the name and location of the bank, and stated the suspect was a black male who left the bank on a bicycle. Nebraska State Patrol ("NSP") Trooper Jeff Rutan was working the morning of April 22, 2017, and he heard the LPD broadcast as he was about to leave the office. Rutan decided he would park his cruiser on the interstate just east of the Waverly, Nebraska interchange, which also provides access to the far east edge of Lincoln, Nebraska. Rutan surmised that if the robbery suspect was headed from Lincoln to Omaha, he may choose that interchange to enter Interstate 80. When Rutan was near his planned position, LPD released another broadcast stating that a White Ford Explorer, approximately year 2005, may be involved in the robbery. LPD

4

included this information in the second broadcast after Investigator Cronin determined that the April 22, 2017 robbery was likely committed by the same suspect who had robbed the bank on February 24, 2017.

Approximately 20 minutes after hearing the second broadcast, Trooper Rutan saw a vehicle matching the broadcast's description traveling east on the interstate. From Rutan's own personal experience as a long-time Lincoln resident, he knew that it would take approximately 20 minutes to travel from the US Bank where the robbery occurred and his location on the interstate. When the Explorer passed, Rutan observed a black male in the driver's seat and no other passengers in the vehicle. Rutan exited the median to follow the vehicle.

The Explorer was traveling at approximately 65 miles per hour. Rutan observed this was odd given the interstate speed limit is 75 miles per hour because, in his experience, most interstate travelers drove at least the speed limit. Rutan did not observe any defects in the vehicle to explain its lower rate of speed.

Rutan remained behind the Explorer. At one point, he was following around 20 yards behind it so he could see the license plate number. While following the vehicle at close range, Rutan observed a bicycle in the back seat that appeared to be upside down. Specifically, he remembers seeing one of the bicycle's wheels. ([Filing No. 34 at CM/ECF p. 79](Filing No. 34 at CM/ECF p. 79)).

Rutan reported seeing the Explorer with a bicycle to other troopers. After relaying this information, he received additional information stating the suspected Explorer would have white-painted bumpers and black door handles. Rutan confirmed the Explorer he was following had white bumpers and black door handles.

When backup officers arrived, Rutan activated his overhead lights to pull over the Explorer. By then, he had followed the Explorer approximately 16 miles. Once the vehicle was pulled over, Rutan drew his gun and ordered the driver to exit the Explorer. McCain complied and got down on the ground. While lying on the ground, McCain asked Trooper Rutan what was going on--what the problem was. Rutan stated he would inform McCain in a little while. When McCain was placed in the back of Rutan's patrol car, Rutan informed McCain that a bank robbery occurred in Lincoln, the suspect was a black male who left the bank on a bike, and a white Ford Explorer was involved. Rutan pointed to McCain's vehicle indicating that it matched that description. McCain responded, "I guess two plus two equals four." Rutan asked McCain to provide his name. McCain provided his first name. Rutan asked if the Explorer was McCain's, and McCain responded in the affirmative. As of that time, McCain had not been advised of his Miranda rights.

While Trooper Rutan and the other officers were standing outside the Explorer, they observed in plain view (without opening the Explorer door) an orange bag lying on the floor in front of the passenger seat and a dark coat with a fur-lined hood beside the orange bag. The officers searched the vehicle and seized the orange bag, coat, bicycle, and other items.

McCain filed the instant motion to suppress on July 18, 2017. He argues the traffic stop violated his Fourth Amendment rights.

6

ANALYSIS

McCain argues his vehicle was stopped, he was seized, and the vehicle was searched in violation of his Fourth Amendment rights. Specifically, McCain argues no traffic violation occurred and there was no reasonable suspicion to believe the vehicle or its occupant had been, or were, engaged in criminal activity. McCain argues the evidence obtained as a result of the search of the Explorer and McCain's statements made at the scene must be suppressed as fruit of an unlawful stop, seizure, and search.

The Fourth Amendment guarantees citizens the right to be free from unreasonable searches and seizures. U.S. CONST. amend. IV. The "detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." Whren v. United States, 517 U.S. 806, 809-10 (1996).

"For an officer to perform an investigatory stop of a vehicle, there must be reasonable suspicion. . . . that criminal activity is afoot." United States v. Walker, 555 F.3d 716, 719 (8th Cir. 2009). "In order for such a stop to be constitutional under the Fourth Amendment, the officer must be aware of particularized, objective facts, which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." Id. (internal citations and quotations omitted). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004). "In evaluating the validity of a stop, we must consider 'the totality of the circumstances[.]'" United States v. Winters, 491 F.3d 918, 921-22 (quoting United States v. Sokolow, 490 U.S. 1, 8 (1989)).

McCain first argues the stop was unlawful because Trooper Rutan was acting on a mere hunch and did not have reasonable suspicion to stop McCain. Specifically, he argues that the LPD acted on multiple hunches to conclude that McCain's vehicle was involved in the April 22, 2017 robbery. He argues LPD acted on that hunch when deciding the white Ford Explorer was involved in the February bank robbery, and there was no proof beyond a speculative hunch that the February suspect and the April suspect were the same person.

The court disagrees. As to connecting the White Ford Explorer to the February robbery suspect, the Explorer first appeared to surveil the neighborhood at 9:07 before it returned at 9:16 with its back license plate removed. (See Gov. Exh. 3, 4, 4A, 4B & 4C). Videos from Homes 1 and 2 show the driver exited the Explorer and walked away from S 52nd Street in the direction of the bank. (Gov. Exh. 3 & 4). The robbery of the US Bank took place at approximately 9:30. (Gov. Exh. 1). At around 9:35 the driver of the vehicle approached S 52nd Street from the direction of the bank, got into the Explorer and drove away. (Gov. Exh. 3, 4, 4D, 4E, & 4F). After the robbery, LPD officers gathered eye witness reports, and they tracked the suspect's footprints in the snow from the apartment complex near the bank to the corner of S 52nd Street and Boeckner Avenue. The information gathered from the videos and law enforcement investigation, considered collectively and in the totality, provided reasonable suspicion—exceeding a mere hunch—to believe the white Ford Explorer depicted on the videos was the robbery suspect's vehicle.

Additionally, the court finds there was reasonable suspicion to conclude the Explorer that Trooper Rutan was following on April 22, 2017 was the same Explorer used in the February robbery. After concluding that the Ford Explorer seen on S 52nd Street was likely involved with the February robbery, Lead Investigator Cronin took extensive efforts to identify and locate the suspect Explorer. He consulted with

8

a car dealership to identify the make, model, and approximate year of the vehicle, ran a computer search, and with the assistance of LPD officers, located and observed the 60 to 70 white Ford Explorers registered in Lancaster County. He concluded none of those vehicles was the vehicle depicted on the February 22, 2017 video recordings—either the bumpers were not white, the handles were not blacks, or the vehicle was otherwise distinguishable. Investigator Cronin then began this same process in Omaha and had eliminated approximately 20 of the 40 possible vehicles before the April 22, 2017 robbery occurred. By the time of the April 22, 2017 robbery, LPD had eliminated 90 of the approximately 110 white Ford Explorers registered in Lancaster and Douglas counties as being the suspect Explorer. In other words, the specific identifiers of the suspect Explorer—white bumpers with black door handles—is uncommon. So when Rutan observed and reported that the white Ford Explorer he was following on April 22, 2017 matched these specific identifiers, there was a fairly high probability that he was following the Explorer connected to the February robbery.

LPD concluded the February and April robbery suspects were likely the same person. McCain challenges this conclusion, arguing the April suspect escaped on bicycle while the February suspect escaped on foot; and the April suspect and February suspect used different bags to collect the money. But the same bank was robbed at the same approximate time of day, with the same employees present and working during the two robberies. Those employees reported to LPD that the suspect was the same person: They reported, and the bank surveillance images confirm, that during each robbery, the suspect was a black male wearing a dark parka with a fur-lined hood. The suspects appeared to have the same height, weight, and general build. (Gov. Exhs. 1 & 5). The employees reported that the April and February suspects had the same mannerisms and voice. Based on a totality of the circumstances, the court finds the two distinctions noted by Defendant—the means of escape and the type of bag used for carrying the money—do not outweigh

the numerous similarities reported by the bank employees, especially since the similarities reported by the employees were characteristics over which the suspect had no control, e.g., his race, height, build, voice, etc. Considered in the totality, the facts gathered from the law enforcement investigation provided reasonable suspicion to believe the same person committed both the February and April robberies.

Considered together, at the time the white Explorer was stopped, LPD had reasonable suspicion to believe the same person robbed the same U.S. Bank location in both February and April, and the suspect used a white Ford Explorer during the first robbery. Trooper Rutan heard the LPD broadcast stating a black male had robbed a bank at 56th Street and Highway 2 and had left the scene on a bicycle. When he was near his position on the interstate, he heard a second LPD broadcast stating a 2005 white Ford Explorer may be involved in the robbery. Approximately 20 minutes later, Rutan observed an approaching white Ford Explorer and when the vehicle passed, Rutan observed that a black male driver was alone in the Explorer. Rutan knew from his own experience, it would take a driver around 20 minutes to get from the bank's location to Rutan's current location on the interstate. Rutan began to follow the Explorer and observed McCain was driving abnormally slow without an apparent reason. When Rutan was within 20 yards of the back of the vehicle, he saw a bicycle or at least a bicycle tire in the back seat of the Explorer. Rutan called in the license plate and reported that he was following a white Ford Explorer. In response to his report, Rutan received additional information that the suspect Explorer would have white bumpers and black door handles: Rutan observed that the Explorer he was following matched that description.

McCain argues that due to the dark-tinted windows, Rutan's testimony that he could see the bicycle in the back seat was not credible. During the hearing, Rutan testified that he was able to see a bicycle upside-down in the back seat when he

was following the Explorer at a close enough range to read the license plate. Later he clarified that he was able to discern a bicycle wheel. As depicted in the photos in evidence, the bicycle was standing upright across the backseat of McCain's Explorer. (Gov. Exh. 6A). The front wheel was situated low down but the back wheel was sticking up toward the ceiling of the vehicle. Based on the Rutan's following distance and the way in which the bike was situated, the undersigned finds Rutan's testimony that he saw the bicycle, or at least a bicycle wheel, credible.

But even if Rutan did not see a bicycle wheel, Rutan had reasonable suspicion supporting an investigatory stop. Rutan heard two broadcasts describing the suspect and his possible vehicle and began following a vehicle and suspect matching that description. United States v. Farnell, 701 F.3d 256, 262 (8th Cir. 2012)("If a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop[.]")(citations omitted). As he followed the vehicle, Rutan received more detail regarding the uncommon characteristics of the suspect Explorer, and those characteristics matched the Explorer he was following. Based on Rutan's own knowledge regarding the robbery time and travel time from that location to the interstate, Rutan knew the Explorer could travel from the robbery location to where it was now seen on the interstate. The court finds that based on a totality of the facts presented, Rutan had reasonable suspicion justifying an investigatory stop of McCain's Explorer.

McCain additionally objects to the search of his vehicle subsequent to the stop. However, it is well settled that an officer may, without a warrant, seize objects that are in plain view, provided that the officer is legally in a position to view the object and the object's incriminating character is immediately apparent. United States v. Khabeer, 410 F.3d 477, 482 (8th Cir. 2005). According to the testimony and evidence, the parka and orange bag containing money on the passenger floor

and the bicycle in the back seat were plainly visible to officers standing outside the closed vehicle. (Gov. Exhs. 6A, 6B, & 6C).

Finally, McCain asks the court to suppress any statements made after he was stopped as fruit of a poisonous stop and search.[3] But as reasoned above, the court finds that the stop and search of McCain's vehicle were lawful under the Fourth Amendment.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b), that the motion to suppress filed by Defendant McCain (Filing No. 22) be denied in its entirety.

The defendant is notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS ORDERED that the jury trial of this case is set to commence before Richard G. Kopf, Senior United States District Judge, in Courtroom 1, United States Courthouse, Lincoln, Nebraska, at 9:00 a.m. on October 16, 2017 or as soon thereafter as the case may be called, for a duration of five (5) trial days. Jury selection will be held at the commencement of trial.

Dated this 18th day of September, 2017.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

---

[3] McCain challenges any statements as fruit of a Fourth Amendment violation, and not as inadmissible under the Fifth Amendment.

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.